```
               UNITED STATES DISTRICT COURT
                 DISTRICT OF NEW JERSEY

GEA MECHANICAL EQUIPMENT          .
U.S., INC.,                       .
                                  .
        Plaintiff,                .  Case No. 20-cv-09741
                                  .
vs.                               .  Newark, New Jersey
                                  .  October 8, 2020
FEDERAL INSURANCE COMPANY, et     .
al.,                              .
                                  .
        Defendants.
```

```
             TRANSCRIPT OF HEARING: COURT'S RULING
              BEFORE THE HONORABLE EDWARD S. KIEL
                UNITED STATES MAGISTRATE JUDGE
```

This transcript has been reviewed and revised in accordance with L. Civ. R. 52.1.

APPEARANCES (the parties appeared via Zoom videoconference):

```
 For the Plaintiff:       DONALD W. KIEL, ESQ.
                          K&L Gates LLP
                          One Newark Center, 10th Floor
                          Newark, New Jersey 07102
                          (973) 848-4000
                          donald.kiel@klgates.com

                          JOSEPH C. SAFAR, ESQ.
                          K&L Gates LLP
                          K&L Gates Center
                          210 Sixth Avenue
                          Pittsburgh, Pennsylvania 15222
                          (412) 355-6443
                          Joseph.Safar@klgates.com

 Audio Operator:

 Transcription Service:   KING TRANSCRIPTION SERVICES
                          3 South Corporate Drive, Suite 203
                          Riverdale, NJ  07457
                          (973) 237-6080
```

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

```
 1   (APPEARANCES continued)

 2
     For the Plaintiff:      ERIN D. FLEURY, ESQ.
 3                           K&L Gates
                             K&L Gates Center
 4                           210 Sixth Avenue
                             Pittsburgh, Pennsylvania  15222
 5                           (412) 355-7425
                             Erin.fleury@klgates.com
 6

 7   For the Defendants:     JOHN MALONEY, ESQ.
                             Gimigliano Mauriello & Maloney, PA
 8                           163 Madison Avenue, Suite 500
                             PO Box 1449
 9                           Morristown, New Jersey 07962-1449
                             (973) 946-8360
10                           jmaloney@lawgmm.com

11                           CAROLINE E. MCKENNA, ESQ.
                             Ford Marrin Esposito Witmeyer &
12                           Gleser, L.L.P.
                             88 Pine Street, 23rd Floor
13                           New York, New York  10005
                             (212) 269-4900
14                           Cmckenna@fordmarrin.com

15                           EDWARD M. PINTER, ESQ.
                             Ford Marrin Esposito Witmeyer &
16                           Gleser, L.L.P.
                             Wall Street Plaza, 23rd Floor
17                           New York, New York  10005
                             (212) 269-4900
18                           Epinter@fordmarrin.com

19

20

21

22

23

24

25
```

1                          <u>I N D E X</u>

2

3    <u>Proceeding</u>                                        <u>Page</u>

4        Proceedings                                    4

5        The Court's Ruling                             25

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (Commencement of proceedings)

2

3              THE COURT:  Good morning, everyone.  We're on the

4     record in matter of GEA versus Federal Insurance Company.

5     It's Case Number 20-cv-09741.

6              If we could have the appearance on behalf of

7     plaintiff.

8              MALE SPEAKER:  On behalf of --

9              MR. SAFAR:  Your Honor, this is Joe Safar from

10    K&L Gates.  And also for plaintiff Don Kiel of K&L Gates and

11    Erin Fleury of K&L Gates.

12             THE COURT:  Good morning, everyone.

13             And then, Mr. Mahoney [sic], can you make your

14    appearance on behalf of defendants?

15             MR. MALONEY:  Sure, Your Honor.  This is John

16    Maloney of Gimigliano Mauriello & Maloney on behalf of the

17    Hartford defendants.

18             I should point out there are a few other defendants

19    in the case that are separately represented.

20             THE COURT:  Oh, they are.  Okay.

21             Is there anybody else on the line?

22             MS. MCKENNA:  Yes, Your Honor.  This is --

23             MR. PINTER:  Yes, Your Honor.

24             Go ahead, Caroline.

25             MS. MCKENNA:  Your Honor, Caroline McKenna from

1  Ford Marrin.  Also on the call, you heard is Mr. Pinter.  As

2  we discussed last week, my admission to the District of New

3  Jersey is pending, but with Your Honor's permission, I'll be

4  speaking on behalf of Continental.  If not, Mr. Pinter can do

5  it as well.

6            THE COURT:  Okay.  Very good.

7            And you have Continental Insurance, Wellfleet,

8  those two companies.

9            And I should put on the record that Mr. Maloney has

10 Hartford Accident and Indemnity Company, Hartford Insurance

11 Company, and First State Insurance Company.

12           So let me just start with maybe Mr. Maloney or

13 Ms. McKenna -- and thank you, everybody, for getting on the

14 call on time and also sending in the joint -- joint letter.

15 And it was very helpful, and I took a good look at it and

16 reviewed a lot of the cases.

17           But it seems to me that -- that the National Union

18 Fire case that Judge Clark had written back in 2018, seems to

19 address very similar or maybe the same issue in this case,

20 and I'm wondering from the defendants' perspective -- and

21 I'll start with Mr. Maloney, if he wants to address this --

22 how is the National Union Fire case distinguishable from the

23 issue that's presented here today?

24           MR. MALONEY:  Sure, Your Honor.  I'm happy to start

25 with that.

1          The National Union -- or the Becton Dickinson case,

2    from our perspective, it is quite distinguishable from the

3    circumstances that we have here.

4          First of all, Becton Dickinson was a suit filed by

5    the insurer as opposed the insured.  And thus the insured in

6    that case did not affirmatively place anything at issue.  But

7    moreover the insurer in Becton Dickinson never contended that

8    it would have defended the insured in the underlying action,

9    and thus had access to the privileged documents.  That's a

10   big and very critical distinction from this case.  It

11   prevents the insurer in Becton Dickinson from arguing that

12   those communications would impact what it would or wouldn't

13   have done.

14         And, as you know, Your Honor, that's one of the

15   significant points that we've tried to raise on this motion

16   that in order to establish a late notice defense under New

17   Jersey law, we need to establish what -- what the defendant

18   wouldn't have done.  And to deprive -- counsel's analysis and

19   communication necessarily deprives the defendants from

20   assessing the issue that's most critical to their defense.

21   You know, what would we have -- what would the defendants

22   have done better or differently if timely notice had been

23   provided?

24         THE COURT:  I thought that that was the same claim

25   that the insurer was making in the Becton Dickinson -- in the

1  <u>Becton Dickinson</u> case that by claiming that the -- that there

2  was no appreciable prejudice and that their notice was

3  timely, that National -- that Becton Dickinson had placed the

4  whole issue of these private communications with this -- with

5  its counsel in issue in the case.  It seemed to be very

6  similar issues and a similar type of thing that they were

7  trying to get in that <u>National Union v. Becton Dickinson</u>

8  case.

9          And whether who was the one that was -- is the

10  plaintiff in the case and filed the complaint first, what the

11  issues that were -- or what with the issues that shook out in

12  that case seemed to be similar, it's -- it didn't really, to

13  me, look like it mattered for this analysis, who filed the

14  complaint first, whether it was a declaratory judgment first

15  by the insured or by the insurance company.

16          But how about you, Ms. McKenna, what -- is there

17  anything further different than you see in that case from

18  this case?

19          MS. MCKENNA:  Yes, Your Honor.  And in addition to

20  what Mr. Maloney said, I would add that in that case, the

21  entire -- the defense counsel himself had been subpoenaed.

22  He was not a party to the case.  And his entire file had been

23  subpoenaed.

24          And so, here, it's obviously not a nonparty's

25  materials or work product that is being sought.  It's a

1    discrete narrower issue of what the insured who breached the

2    conditions of the contract and then brought this suit was

3    told and then how they acted on that information.  So it's a

4    narrower issue being sought here, Your Honor.

5            THE COURT:  Yeah, sorry to -- sorry to interrupt

6    you, Ms. McKenna.

7            But the way that I read your papers when I read --

8    or the way that I read defendants' position was they were

9    looking for all the communications and all the privileged

10   documents between GEA and its counsel, not just some targeted

11   specific documents.

12           Am I mistaken about that?

13           MS. MCKENNA:  You're not, Your Honor.  I was making

14   the distinction between directly subpoenaing the defendant's

15   counsel's entire file, including things that were provided to

16   the client and what we're seeking here which is what the

17   client was actually provided by defense counsel.

18           THE COURT:  Oh, so then -- so then the distinction

19   that you're seeing is in the National Union case, there was a

20   greater degree of information that was sought through the

21   subpoena to the counsel than what you're seeking here?

22           MS. MCKENNA:  Correct.

23           THE COURT:  Okay.  All right.

24           And, Mr. Safar, you got any comments about the

25   National Union case, because it seems to be really something

1    that is in this district, written by Judge Clark only a

2    couple of years ago, and it seems to be similar to the issues

3    in this case.  So I'd like to hear from you on what you think

4    about that case.

5            MR. SAFAR:  Your Honor, absolutely.  Thank you very

6    much.

7            I think it is -- not only is it similar, but I

8    think it's really on all fours.  There's no reason for a

9    different result in this case.  And I'm going to confine my

10   comments, unless Your Honor has -- would like -- would like

11   more, I'm going to confine them to rebutting some of the

12   assertions that we've heard from Mr. Maloney and

13   Ms. McKenna --

14       (Simultaneous conversation)

15           MR. SAFAR:  Okay.  First of all, Mr. Maloney says

16   that it's distinguishable because that was a suit filed by

17   the insurer, and in that case the policy holder didn't place

18   it at issue.  Of course, in their papers, they say that --

19   that GEA placed late notice at issue through its affirmative

20   allegations in paragraph 19 of the complaint.  I don't know

21   if Your Honor has taken a look at paragraph 19 of the

22   complaint.  But all paragraph 19 -- and they badly

23   mischaracterized paragraph 19 of the complaint.

24           All paragraph 19 --

25           THE COURT:  I've read the complaint.  I have read

1    the complaint.  But I wasn't focused on paragraph 19.  But I

2    have it in front of me now.

3            MR. SAFAR:  Paragraph -- oh, so you see all

4    paragraph 19 alleges is a general allegation that all

5    applicable conditions precedent to recovery, if any, have

6    been satisfied.

7            And that's where they hang their hat and say that's

8    how the plaintiffs affirmatively put late notice at issue.

9            But, of course, under New Jersey law, late notice

10   is an applicable condition precedent.  It's an affirmative

11   defense.  And they know that it's an affirmative deference

12   because they all alleged it as an affirmative defense.

13   Hartford alleged it as an affirmative defense, as its tenth

14   affirmative defense.  CNA and Wellfleet alleged it as their

15   sixth affirmative defense.  And CNA and Wellfleet went even

16   further, and their answers have counterclaims.  They asserted

17   counterclaims for late -- for late notice.

18           So that puts it on -- that puts it on four squares

19   with the Becton Dickinson case.  They're the ones that

20   alleged it and put it at issue.  And this is -- it just boils

21   down to very, very simply what -- what -- you know, stripped

22   of all the smoke and mirrors.  They want to assert a -- they

23   have asserted -- they have affirmative defenses that they

24   want to assert, and they think the privileged documents are

25   relevant and would be helpful to them.

 1            But, of course, that's not the standard for

 2     piercing privilege.

 3            Second, this motion that they would have been

 4     entitled to documents if they had chosen to defend the case,

 5     that -- that's -- that is faulty on two scores.  One, it's a

 6     totally unsupported counterfactual premise.  We have --

 7     they've made no factual showing that they, in fact, would

 8     have accepted the defense of the case.  Of course, we all

 9     know from Insurance 101 that when an insurance company gets

10     notice of a case, they have three options:  Deny; reserve

11     rights to deny; or unconditionally accept and participate in

12     the case.

13            Under the first two scenarios, deny and reserve

14     rights to deny, they don't get access to privileged

15     information.  There's no question there, because they've set

16     up an adversarial relationship with the policy holder.

17            Of course, we all -- we know further as a data

18     point that in this case, they got notice while the defense

19     was still alive, albeit while there were posttrial motions

20     pending, and they then chose to deny.  They could have

21     accepted the defense then.  They could have said we're taking

22     this case over.  We're prosecuting the posttrial motions.

23     We're going to run the appeal, you know, blah, blah, blah.

24     But they didn't.

25            At that point, they chose to deny and set up an

1   adversarial relationship with the policy holder.

2          Now, they're coming in to Your Honor and making

3   unsupported assertions of counsel in a letter saying that if

4   we had gotten notice earlier, we would have defended the

5   case.  We don't know that --

6       (Simultaneous conversation)

7          MR. SAFAR:  We don't know that that's the case.

8   And I'm --

9       (Simultaneous conversation)

10          THE COURT:  Let me just interrupt you for one

11   second, Mr. Safar, and maybe this is my misunderstanding of

12   the facts.

13          I thought that the -- that the way that the case

14   was positioned now was that the -- that the carriers take the

15   position that they would have covered, had they provided

16   notice, but the time -- but the notice itself was untimely.

17          Have they disclaimed coverage as well and say that

18   the notice was untimely?

19          MR. SAFAR:  They've -- they've disclaimed coverage.

20          THE COURT:  Oh, okay.

21          MR. MALONEY:  No.

22          MR. SAFAR:  And so -- so the assertion that they

23   would have unconditionally accepted, had the notice been

24   given earlier, is unsupported.  It's simply an assertion.  We

25   have no affidavits, no factual support for that.

1          I will say that we -- interestingly, we asked in

2   discovery in this case for the insurers', you know, policies,

3   procedures, guidelines that they use to decide when they

4   deny, reserve rights, or accept coverage.  The response we

5   got back from Mr. Maloney, who represents the primary

6   insurers, "Objection, not relevant."  Okay?

7          So I can't even test Mr. Maloney's assertion that

8   they would have accepted coverage, had the notice been given

9   earlier.  Maybe they would --

10       (Interruption in proceedings)

11         MR. SAFAR:  Maybe they --

12       (Simultaneous conversation)

13         THE COURT:  Let me ask Mr. Maloney that.  Let me

14  ask Mr. Maloney that, because that's an issue that I didn't

15  know was in play.  I thought that the issue of coverage had

16  been resolved.

17         But is the issue of coverage itself and whether

18  this claim is going to be disclaimed based upon just the

19  policy as opposed to the untimely notice, is that still --

20  still at issue?

21         MR. MALONEY:  No, Your Honor.  This case is about

22  late notice and lack of cooperation.

23         And -- are far more -- this is the third claim

24  tendered to Hartford by GEA involving underlying asbestos.

25  And -- was involved in the defense of the prior two claims,

1    Hartford communicated with counsel -- updates from counsel.

2    And those claims were, you know, relatively minor and were

3    dismissed without any cost to -- you know, in terms of

4    settlement -- by GEA.

5           The point is our first step -- case is that -- of

6    proper and timely tender of notice -- whenever you're being

7    asked to recreate the past, you know, there is no magic eight

8    ball that allows one to go back and say, well, what would

9    have happened with certainty?  So that's why we need the

10   facts that -- as to what was going on in the underlying

11   Thornton action, because that's exactly how Hartford will be

12   in a position to establish what it would have done.  Those

13   are the -- those communications that are at issue in this

14   case are the exact communications that The Hartford would

15   have relied on.  For example --

16       (Simultaneous conversation)

17           THE COURT:  Well, isn't that what Judge Clark

18   addressed in their -- in his decision that that's really not

19   the focus of what the communication would have been between

20   the lawyer and the client, but what -- what the carrier would

21   have done differently based upon what information that the

22   carrier had in front of him?  The pleadings, from

23   depositions, from those types of things?

24           MR. MALONEY:  But, Your Honor, let me give you an

25   example of why I think that this is different.

1          And certainly it isn't addressed in the Becton

2    Dickinson case.

3          We know that GEA missed multiple settlement

4    opportunities, although, candidly, we have scarce facts

5    around those settlement opportunities.  But we know that

6    there was at least a mediation and that were offers made or

7    demands made upon GEA to settle.

8          If Hartford were defending the case or were

9    involved in the defense of the case, there's no doubt that

10   GEA would have said, hey, Hartford, there is demand here of X

11   dollars.  You know, what do you think?  Do you want to -- do

12   you want to contribute something to settle this case?  That's

13   how the insured-insurer relationship works.

14          And --

15      (Simultaneous conversation)

16          THE COURT:  But then -- but then if that actually

17   happened, wouldn't Hartford have undertaken its own analysis

18   and looked through everything on its own and made its own

19   determination as to what they would have done?

20          MR. MALONEY:  Oh, Hartford would have relied on the

21   analysis of GEA's counsel, which would have been

22   communicating with GEA and with Hartford saying, this is what

23   we view the case to be worth, this our analysis of the case.

24   I mean if there was a mediation in this case -- and I'm going

25   to use hypotheticals, because I don't have real numbers, but

 1  let's say there was a demand made upon GEA for a hundred

 2  dollars.  And let's say GEA's counsel said, well, we think

 3  this case is worth $50.  But, you know, we would recommend an

 4  offer of $40.  And let's say that GEA said, we're not going

 5  to follow that advice, so we're going to make an offer of

 6  $1.50.  Well, that's pretty significant, Your Honor, because

 7  that same advice as to the value of the case would have been

 8  tendered to Hartford, and Hartford would have been the one

 9  paying it and controlling the decision as to what money to be

10  paid.

11          So to analyze after the fact what Hartford would

12  have done in a situation -- tremendously handcuffed without

13  Hartford having the information that would have guided --

14          THE COURT:  You started breaking up.  I think you

15  were finished.

16          Mr. Safar.

17          MR. SAFAR:  Yeah, Your Honor, thank you.  I just

18  want to --

19          THE COURT:  Oh, I'm sorry.

20          MR. SAFAR:  I want to return just kind of where I

21  was before we -- before we went off on the point that

22  Mr. Maloney just made.

23          And just one last point on this idea that --

24          THE COURT:  Sure.  Go ahead.

25          MR. SAFAR:  That they would have had access to the

1  privileged documents.

2         Even if we accept the -- the unsupported assertion

3  that the -- first of all, Hartford has asserted in their

4  answer, 36 separate affirmative defenses.  So this is the

5  first time I've heard from Mr. Maloney that the only issue in

6  this case is late notice, but it sounds like an amended

7  answer is in order now, dropping every affirmative defense

8  except for late notice.  And unless that's forthcoming, I

9  think what we, you know, just heard is that posturing for

10  purposes of this -- of this motion only.

11         But even accepting the unsupported assertion that

12  they would have unconditionally accepted coverage earlier as

13  opposed to reserve rights, even doing so, doesn't

14  automatically entitle them to privileged documents under that

15  counterfactual scenario, because all that does is it

16  create- -- all -- all an unconditional acceptance does is

17  create a common interest between the policy holder and the

18  insurer creating the option to share privileged materials

19  without waiving as against the plaintiffs.  It doesn't create

20  a compulsion to share them.  And that's clear under the *In re*

21  *Environmental Insurance Coverage Actions* case.  It's not a --

22  common interest is not a compulsion to share.  It's -- it

23  merely creates a permissive situation to share.

24         So, again, the premise that they would have been

25  entitled to the documents is unsupported, and it's wrong.

 1   But let me --

 2        (Simultaneous conversation)

 3             THE COURT:  But also when I read Judge Pisano's

 4   decision that you guys all cited as well in the NL Industries

 5   case, it seemed pretty clear from Judge Pisano's decision

 6   that this common interest only applies when the insurer has

 7   actually retained counsel and has paid for it.  And whether

 8   they want to come back later on and say, hey, we would have

 9   retained, is that doesn't create the common interest

10   retroactively.  That's my understanding of Judge Pisano's

11   decision was back in that case.

12             MR. SAFAR:  Absolutely correct, Your Honor.

13             And then -- and so -- and now turning to the

14   argument that Mr. Maloney --

15             THE COURT:  Can you just hold on one second.

16   Mr. Safar?  Can you just hold on one second?

17             MR. SAFAR:  Sure.

18             THE COURT:  I just need to do one thing.

19        (Pause in proceedings)

20             THE COURT:  Sorry.  I apologize, everyone.  I have

21   another conference at 9:30, and I probably overbooked, but I

22   want make sure that I have plenty of time for you guys.

23             Okay.  So, go ahead.  I'm sorry.

24             MR. SAFAR:  Your Honor -- yeah, Your Honor.

25   This -- this really gets to the heart of the Becton case.

1   Right?  First of all, the insurers in <u>Becton</u> actually did

2   argue that they would have accepted the defense.  It's the

3   same argument Mr. Maloney made.  And if there's any -- if

4   there's any question about that, we're happy to -- we're

5   happy to send in the briefs where <u>National Union</u>, in fact,

6   advanced that, you know, same argument.  But I don't think

7   that's -- that's neither here nor there.

8           The idea that they need the subjective analysis of

9   counsel to be able to second-guess or make their own

10  determinations about what they would have done to defend the

11  case, doesn't hold together.  Right?  I mean, legal advice,

12  these -- this advice of counsel really consists of three

13  things.  Right?  It's the application of law and counsel's

14  judgment to the facts of the case to arrive at a

15  recommendation about a course of action to be taken in the --

16  in the defense.  Right?

17          They have three out of those four things are not

18  privileged.  The facts of the case are not privileged.  The

19  law is not privileged.  Right?  And the actions that counsel

20  actually took are -- as the <u>Becton</u> case recognizes are

21  reflected in the nonprivileged record.  They can look at the

22  trial transcript, look at the motions that were filed, look

23  at the experts that were presented, look at the arguments

24  that were made.  They can see -- they can see the offers,

25  the -- you know, someone demands, they can see the responses.

1    They can see the offers.  We're not saying that that's

2    privileged.  In some instances, it was oral, so they're going

3    to have to seek discovery of it, you know, either through a

4    deposition or by asking interrogatories, but anything that

5    was exchanged with the plaintiffs, that's obviously, fair

6    game.

7            So all that they're missing -- right? -- is

8    counsel's subjective analysis.

9            But just -- as Your Honor just pointed out, they

10   don't need that to decide or to make an argument about

11   whether or not they would have done something differently.

12   They have all the ingredients, and they can say, based

13   upon --

14       (Simultaneous conversation)

15           MR. SAFAR:  -- they can hire an expert or whatever,

16   based upon the law, based upon the facts --

17       (Simultaneous conversation)

18           MR. SAFAR:  -- we wouldn't have done -- we wouldn't

19   have zigged --

20       (Simultaneous conversation)

21           THE COURT:  Mr. Safar, you know, and I -- and I

22   appreciate that argument, and I know that's what Judge Clark

23   had decided.

24           But I think from the defendants' perspective, what

25   they're saying is, hey, we have the ingredients.  But there's

1   a chef out there, and there's this great lawyer, he's got a

2   lot of experience, he's got trial experience, he can give us

3   some more flavor to the case, and that may have been

4   something that may have influenced us.  I think that's their

5   counter to that argument.

6           But I understand certainly where you're coming

7   from, Mr. Safar.

8           MR. SAFAR:  Right.  But -- but that really just

9   boils down to, well, that would be one more thing that would

10  be helpful.  Right?  And that's not the standard for piercing

11  our privileges.  It's not just that it would be helpful --

12  and let me just say, Your Honor, that if -- and I don't -- it

13  doesn't sound to me like you're, you know, heading in this

14  direction, but there's a serious goose-and-gander issue here,

15  which is that if our privileges are pierced so that they can

16  see what counsel's advice was so that they can then take --

17  so they can have somebody take the stand, presumably some

18  claims handler, and say, oh, well, if I was privy to that

19  advice, I wouldn't have followed it.  I would have taken the

20  case in a different kind of direction.

21          Now, they've put at issue when their own claims

22  handlers choose to follow counsel's advice or not.  And if

23  they get this discovery, I have to get rebuttal discovery in

24  order to be able to rebut that, because if their own files

25  are filled of -- filled with examples from other cases with

1    similar facts -- right? -- where their claims handlers, in

2    fact, followed similar advice to what they got from our

3    counsel, they cannot be allowed to take the stand and

4    introduce into evidence our privileged documents and say in a

5    totally unrebutted manner that they wouldn't have followed

6    that advice, because in their decades of experience as claims

7    handlers, that's not a piece of advice that they would

8    follow.  Right?  And so now we have just opened up Pandora's

9    box on this, because -- because, you know --

10        (Simultaneous conversation)

11            THE COURT:  We're not at that point right now --

12   we're not at that point right now.  But that's -- but that

13   may be an issue that we'll address later, but I'd like to

14   stick to this.

15            So let me just finish up.

16            Anybody from the defendants' side want to add

17   anything further?  I read all the papers.  I understand the

18   arguments.  I've read all the cases that you -- that the

19   parties have cited to me.

20            So I'll ask the defendants if they have anything

21   further?

22            MR. MALONEY:  Yes --

23            MS. MCKENNA:  Yes, Your Honor go ahead --

24            THE COURT:  Okay.  Why don't we start with

25   Ms. McKenna, since she got to go second.

1          MS. MCKENNA:  Thank you, Your Honor.

2          I just would -- I'm going to focus on the point

3   Mr. Safar made about us raising late notice as an affirmative

4   defense.  You know, other cases besides Becton, including the

5   Human Tissues Product Litigation case --

6          THE COURT:  Yeah, sure.

7          MS. MCKENNA:  -- talk about whether you put

8   something in issue as being an issue of fairness.

9          And, here, you know, we didn't allegedly notice --

10  our reason.  We alleged late notice because plaintiffs

11  provided extraordinarily late notice after a $70 million

12  verdict was entered.

13          So the idea that it's an affirmative defense and,

14  therefore, it's not at issue because we pled it as an

15  affirmative defense, I think, really misses the mark and

16  shows kind the unfairness of plaintiff's position.

17          THE COURT:  Okay.  Thank you very much.

18          And then Mr. Maloney?

19          MR. MALONEY:  Yeah, if I could just add to

20  Ms. McKenna's comments, in the Human Tissue case, Judge Falk

21  set forth a three-part test to determine what is at issue.

22  And I don't think there's -- there should be any real dispute

23  that we satisfy that three-part test, that GEA made an

24  affirmative act which Judge Falk described as filing a suit

25  that put the information at issue by making it, quote,

1   relevant to the case.  Relevant to the case doesn't

2   necessarily mean relevant to GEA's claims, although they are,

3   but it's also relevant to the -- in this case.

4        The third prong of that test is that the assertion

5   of privilege would deny the defendants access to information

6   vital to their defense, which, again, as we discussed at

7   length, I think, is clear here.

8        And if I could turn Your Honor's attention to the

9   Hoechst Celanese case, in that case, the exact same

10  allegations of compliance with policy conditions were

11  expressly found to have placed privileged communications at

12  issue, which is the point that Mr. Safar was making.  And --

13  Celanese case -- and I think it's a Delaware case, although

14  Delaware law on this issue is not substantively different,

15  but Hoechst Celanese is really instructive, because in that

16  case, the Court found that whether the insured had complied

17  with those conditions of coverage "can only be truthfully and

18  fairly determined by an examination of the conduct of the

19  insured and its counsel in the underlying litigation."

20       It went on to say that "to hold otherwise would

21  permit an insured to seek coverage for claims while denying

22  the insurer access to information about the underlying

23  claims, which is contained substantially, if not exclusively

24  within the communications claimed to be privileged."

25       And that's the point we've been making all along,

1  Your Honor, that this isn't a case where we're seeking a

2  broad, you know, ability to pierce the privilege simply

3  because there's a coverage dispute.  This is a lot more

4  narrow than that, and it's focused on the fact that if we're

5  going to establish what we would have done, we have to have

6  the facts that would have been available to us at the time.

7          THE COURT:  Okay.  All right.  Well, thank you very

8  much.  I did look at the Hoechst Celanese Corporation case.

9  That was a case out of the District of -- I'm sorry -- the

10  Delaware Superior Court back in 1992.  It was a complicated

11  case that involved communications between a counsel and the

12  client during different periods of time when there was

13  coverage and there was a denial of coverage.  And I

14  appreciate you going over that case with me.

15          All right, everyone.  Let me just get my papers

16  together.  And let me ask you, Mr. Safar -- this is sort of a

17  silly question.  Is it GEA or GEA?

18          MR. SAFAR:  It's either, Your Honor, GEA

19  mechanical.  GEA.  It's all -- it all works.

20          THE COURT:  Okay.  Okay.  I'll call it GEA, since

21  it's easier to say.  All right.  Very good.

22          Well, in this case, plaintiff seeks coverage for an

23  asbestos claim that resulted in a judgment against plaintiff

24  in the amount of $70 million.  And the underlying complaint

25  that resulted in this declaratory judgment action was filed

1    in Florida in 2017 by Charles and Constance Thornton.  The

2    Thornton action proceeded to trial in June of 2019.  And the

3    Thorntons claimed that damages resulting out of

4    Mr. Thornton's alleged exposure to products that contained

5    asbestos that were allegedly made, sold, or distributed by

6    GEA's predecessor in interest.  The jury returned a verdict

7    of $70 million.  And judgment was entered in June 2019.

8              And in August of 2019, while posttrial motion and a

9    potential appeal were pending, plaintiff tendered the

10   Thornton claim to some of the defendants, and prior to that

11   notice, plaintiff had not provided any notice of the Thornton

12   claim to defendants; at least that's my understanding of the

13   facts.

14             And in September 2019, plaintiff participated in

15   mediation and kept defendants apprised of what was going on.

16   A confidential settlement was reached with the Thorntons on

17   September 24th, 2019.  And the defendants, apparently, did

18   not object to the settlement; at least, that's what I read

19   from the papers.

20             Defendants have disclaimed coverage, as I

21   understand it, based in part on what they believe was an

22   impermissibly late notice of the claim by plaintiff.  The

23   complaint was filed on August 6th, 2019, in New Jersey

24   Superior Court and removed to this Court on July 31st.

25             The parties submitted a joint letter on

1    September 21st -- did somebody just join?

2              FEMALE SPEAKER:  Good morning, Christina --

3              THE COURT:  Is this on the Hollands matter?

4              FEMALE SPEAKER:  Oh, no, this is not.  This is the

5    wrong conference line.  I apologize.

6              THE COURT:  Okay.  Thank you.

7              FEMALE SPEAKER:  Bye.

8              THE COURT:  With COVID and everything, all these

9    technology things, we have a lot of people coming in

10   sometimes.  And I apologize for that.

11             But going back to what the parties submitted a

12   joint letter on September 21st concerning a discovery dispute

13   involving the defendants' request for certain information.

14   That was ECF Number 10.  And the dispute centers around

15   whether plaintiff is required to produce documents and

16   information relating to the underlying Thornton action that

17   is subject to the attorney-client privilege.  To date,

18   plaintiff has said that it produced over 70,000 pages of

19   documents, but withheld the attorney-client privileged and

20   attorney work product documents from the production.

21   Plaintiff also objected on certain relevancy grounds as to

22   certain requests.

23             So as a threshold matter, defendants, as I

24   understand it, don't dispute that the withheld documents

25   would normally be protected by the attorney-client privilege

1  and the work product privileges, because they encompass

2  defense strategy and analysis and settlement negotiations,

3  settlement analysis and things that would normally be

4  protected by the privilege.  The defendants argue that

5  they're entitled to view what would normally be privileged

6  because plaintiff and its counsel in the underlying case, as

7  well as the attorney work product -- as well as the

8  attorneys' work product, because GEA has placed these

9  communications in issue in the case.  And defendants argue

10  the communications are in issue because plaintiff claims the

11  notice to defendants of the Thornton action was not untimely,

12  while defendants take the position that the notice was

13  impermissibly untimely.  Whether it's an affirmative defense

14  or -- or, like in the case before Judge Clark, it was an

15  affirmative claim or a declaratory judgment affirmative claim

16  by the insured, I don't think is really relevant.

17        Under New Jersey law, in order for a carrier to

18  succeed on a defense of untimely notice, the insurer must

19  show that there's a breach of the notice provision of the

20  policy and a likelihood of appreciable prejudice.  To

21  demonstrate this appreciable prejudice, defendants must prove

22  that, first, substantial rights have been irretrievably lost

23  by virtue of the failure of the insured to provide notice in

24  a timely fashion; and, second, the likelihood of success of

25  the insurer in defending the claim.

1          Defendants also argue that had timely notice been

2    provided, it would have been able to participate in the

3    defense of the Thornton action and would I have access to

4    plaintiff's counsel's files.  And defendant proffers that

5    from what has already been produced, there seems to be

6    evidence that there were opportunities to settle the

7    underlying case for what they call a fraction of the judgment

8    amount.  I don't have those facts in front of me, but I take

9    their representation.

10          Thus, according to defendant, attorney-client

11   communications relating to the settlement proposals, the

12   evaluation and analysis of the claims and the settlement

13   demands and the decisions made in responding to the

14   settlement demands are relevant to the issue of appreciable

15   prejudice.  This is because defendants would have had the

16   opportunity to evaluate any settlement demands in conjunction

17   with and in light of the advice of GEA's counsel, since

18   defendants would have been funding a settlement and probably

19   funding the defense cost as well.

20          If defendants were not able to obtain the

21   privileged communications, defendants say it would create "a

22   formidable obstacle" to their efforts to determine whether

23   they would have acted differently, had timely notice been

24   provided.  And withholding the communications would deprive

25   defendants of the very information that they would have used

1   in evaluating the course of the underlying litigation, and

2   from the defendants' perspective, indeed, these

3   communications would have been provided to defendants if --

4   if the plaintiff had timely notified the defendants and the

5   defendants were able to participate in the defense of the

6   underlying case.

7            On the other hand, plaintiff argues that an

8   attorney-client privilege should not be pierced and should

9   not be pierced in this case, and the case law says that it's

10  only pierced in the narrowest of circumstances.  And

11  plaintiffs cite the cases that they say stand for the

12  proposition that the privilege is only pierced where a

13  constitutional right is at stake or where a party has

14  explicitly waived the privilege.  Plaintiff views binding

15  case law as finding a waiver of the privilege where a party

16  seeking to claim the privilege is using -- is seeking to use

17  the privileged communication and information to prove its

18  claim or defense in the case.  So, in other words, a court

19  will not let a responding party use the attorney-client

20  privilege both as a sword and a shield.  So if a responding

21  party will use communication as a sword -- for example, to

22  disclaim liability based on the advice of counsel -- the

23  responding party cannot then prevent the requesting party's

24  attempt to gather discovery relating to that advice of

25  counsel.  I think that's black-letter law and everybody

1    agrees with that.

2          Under that understanding of case law, plaintiff

3    argues that defendants are not entitled to the production of

4    any privileged information because plaintiffs does not --

5    because the plaintiff does not intend to rely on any

6    privileged communication or information to prove its claim or

7    defenses or anything in this case.

8          Plaintiff also argues that defendants have not

9    cited to a single case in this district where a court has

10   held that a party seeking coverage under an insurance policy

11   placed privileged communications in issue and thereby was

12   required to produce such communications.  Plaintiffs cite to

13   various cases, you know, that stand for their position on

14   this -- on this issue.

15         Plaintiffs also argued that a privileged

16   communication and information are irrelevant because the

17   inquiry relating to appreciable prejudice is what action the

18   insurer would have taken, rather than the actions taken by

19   the insured, which is what the privileged information would

20   show.  The burden is on the insurer to show what specific

21   steps it would have taken to achieve a more favorable result.

22   Thus, according to plaintiff, it is not relevant why the case

23   was handled in the manner it was, but what the insurers would

24   have done differently under the circumstances and they have

25   all the facts in front of them.

1           Finally, defendant says that -- I'm sorry.

2           Finally plaintiff says that defendants have not

3    demonstrated there are less restrictive means to obtain the

4    relevant information it seeks.  It has produced over 70,000

5    pages of documents, and from reading of it, I assume those

6    documents encompass all the pleadings and depositions,

7    motions; correspondence between the parties; trial binders;

8    mediation memos; and any other nonprivileged documents

9    relating to the underlying case.

10          So the issue, as I see it, is whether the

11   privileged information and documents defendants seek will be

12   relevant to defendants' claim of appreciable prejudice

13   resulting from plaintiffs' alleged late notice of the

14   Thornton claim.

15          When a case is based upon federal diversity

16   jurisdiction, courts decide issues of privilege based upon

17   state law.  _In re Ford Motor Corp._, 110 F.3d 954 (3d Cir.

18   1997).  _In re Kozlov_, 79 N.J. 232 (1979) the New Jersey

19   Supreme Court set forth the analysis to be conducted to

20   determine whether to compel disclosure of a privileged

21   communication.  Under that decision, the party seeking

22   disclosure must establish first there's a legitimate need for

23   the evidence; second, the evidence must be relevant and

24   material to the issues before the court; and, third, by a

25   preponderance of the evidence, the requesting party must show

1    that the information cannot be secured from less intrusive

2    means.

3         When a party places confidential communication in

4    issue, that party voluntarily creates a need for the

5    disclosure of those confidences.  <u>State v. Mauti</u>, 208 N.J.

6    519 (2012).  Under New Jersey law, in order for a carrier to

7    succeed on a defense of untimely notice, the insurer must

8    show there's a breach of the notice provision in the policy

9    and a likelihood of appreciable prejudice.  That is <u>Cooper v.</u>

10   <u>Government Employees Insurance Company</u>, 51 N.J. 80 (1968).

11   In determining whether appreciable prejudice exists, courts

12   must look at whether, first, substantial rights have been

13   irretrievably lost by virtue of the failure of the insured to

14   provide notice in a timely manner, and, second, the

15   likelihood of success of the insurer in defending the claims.

16   <u>Morales v. National Grange Mutual Insurance Company</u>, 176 N.J.

17   Super. 347 (Law. Div. 1980)

18        The issue presented here was addressed by Judge

19   Clark in his decision in the <u>National Fire</u> case, which is at

20   2018 WL 627378 (D.N.J. 2018).  In that case, an insured

21   waited 16 years from the commencement of a case and 10 years

22   after a $100 million settlement of two antitrust cases to

23   tender the claim to the carrier.  Like in this case, in

24   <u>National Union</u>, the insurer argued that it needed to review

25   privileged communications between the insured and its

1   attorney in the underlying action as part of its defense that

2   it suffered appreciable prejudice.  The carrier wanted to

3   depose the insured's attorney concerning evaluations of

4   strategy and impressions regarding the merits of the claim.

5   And, like in this case, the insurer in National Union argued

6   that privileged information and communication with the

7   attorney were placed in issue, because plaintiff's position

8   that it was timely notified -- because of plaintiff's

9   position that it timely notified defendants created the need

10   for the disclosure of privileged communication and, thus, the

11   insured waived the privilege.

12        In that case, Judge Clark found two flaws in the

13   same arguments being made here by defendants.  First, that

14   any defense by an insurer based upon appreciable prejudice

15   against an insured's claim for coverage would always then

16   require the disclosure of privileged information, and such a

17   conclusion would create too wide of an exception to the

18   attorney-client privilege.  So, in other words, there must be

19   something more than a defense based on untimely notice,

20   because then every coverage case where untimely notice is an

21   issue would require the disclosure of privileged information

22   and communication.

23        And, second, Judge Clark found the carrier's

24   argument mischaracterized the relevant inquiry and the burden

25   of proof to determine appreciable prejudice.  In National

1   Insurance, the insured argued that the carrier could not have

2   achieved a better result.  Although facially it appears to be

3   a different issue than in this case, in reality, it's, to me,

4   is the same issue.  In this case, defendants want to see the

5   privileged documents because they want to show that they

6   would have achieved a better result than GEA, and, to me,

7   that's just a mirror image of the insured's position in

8   National Union that the carrier would not have a better

9   result.

10          And Judge Clark noted that the inquiry is not on

11   the effectiveness of the attorney in the underlying case, but

12   the -- what the insurer would have done differently to

13   achieve a better result.  And so the burden is on the carrier

14   to show this.

15          Like Judge Clark, I also surveyed the case law in

16   this district and looked at the cases cited by the parties.

17   Judge Clark did not find a single case in which a judge

18   allowed the piercing of the attorney-client privilege based

19   on a carrier's defense of an impermissibly untimely notice.

20   And from my research, that has not changed in this district

21   since Judge Clark's opinion in 2018.

22          And Judge Clark also found that the carrier did not

23   meet its burden to show that there were no less intrusive

24   means to obtain the information.  Judge Clark wrote that the

25   insurer may obtain information it needs to show appreciable

1    prejudice from a variety of nonprivileged sources, "including

2    the pleadings, motions, depositions, transcripts,

3    communications between opposing counsel, and any discovery

4    produced therein, and by examining such sources plaintiff

5    should be able to develop its own information and impressions

6    regarding the underlying action and present its argument as

7    to what it would have done differently and what more

8    favorable outcome it would have achieved under the second

9    part of the appreciable prejudice inquiry."

10           Further, defendants can inquire about

11   plaintiff's -- can inquire through plaintiff's

12   representatives about the analysis of the case and settlement

13   strategy without delving into attorney-client privileged

14   communication.  Judge Clark cited as an example that

15   plaintiff's 30(b)(6) representative could be questioned why a

16   certain demand was not accepted without testifying about

17   privileged communication.  And the witness can certainly

18   testify about his own analysis of the settlement demands and

19   claims.

20           Although not explicitly stated, a logical extension

21   of defendants' argument and that the need to know what the

22   communication and advice was from GEA's attorney is that they

23   need to know that in the underlying action because they would

24   have been privy -- they would have been privy to that

25   information, and their decisions would have been informed by

1    the advice of counsel.  But, again, this is not the analysis,

2    and I agree with Judge Clark that that is not the analysis.

3    Defendants can review all the same documents, information,

4    settlement demands and settlement offers that were on the

5    table and make their own analysis of how they would have

6    reacted.  They can consult with competent counsel, which I am

7    sure defendant knows, to perform an independent legal

8    analysis.  And in this way, there are less intrusive ways to

9    obtain the information to demonstrate appreciable prejudice,

10   which will likely be what I figure an attack on GEA's failure

11   to settle the case prior to trial.

12          I also note Judge Pisano's decision in NL

13   Industries, 144 F.R.D. 225, (D.N.J. 1992), also cited by the

14   parties and in that case, the carrier sought the production

15   of privileged communications between the plaintiff and its

16   attorney in an underlying environmental action.  The carrier

17   argued it was entitled to the information because it had a

18   common interest with plaintiff and the insured that placed

19   the privilege communication at issue in the case.  Judge

20   Pisano denied the request finding that there was no common

21   interest and the communications were not placed in interest

22   and the information sought was irrelevant.  Judge Pisano

23   found that common interests may be found only when the

24   carrier retained the attorney.  Facts of Judge Pisano's case

25   are certainly distinguishable in a way in that the carrier

1    had denied coverage, and I understand that the carrier is

2    taking the position that it would not have denied coverage in

3    this case.  But the carrier in Judge Pisano's case asserted a

4    common interest.

5         But the result should be no different in this case.

6    Here, defendant did not know of the claim and therefore did

7    not retain counsel to defend plaintiff.  But that fact does

8    not change the analysis and thereby retroactively confer a

9    common interest relationship between the carrier and GEA.

10   GEA retained its counsel, which only served and represented

11   GEA and only shared privileged communications with GEA.

12         And I can't -- those -- those who are coming on the

13   Holland -- can you just please stand by?  Hollands matter.

14         We cannot assume these privileged communications

15   would have been exactly or even substantially the same if

16   defendants were providing coverage at the time.  In fact, I'm

17   pretty confident, including that GEA's attorneys' analysis --

18   with its clients, analysis of the settlement discussions and

19   evaluation of the claim would have been substantially

20   different had there been a carrier backing up the defense and

21   indemnifying GEA.  It's too far of a stretch to conclude that

22   an attorney representing what he or she believed to be an

23   uninsured client would have acted in the same manner if there

24   were confirmed insurance coverage.  Thus, that attorney's

25   mental impressions and analysis of settlement positions and

1   strategy are not, in my mind, relevant to what, if anything,

2   defendant would have done differently.

3          To me, the flaw in defendants' logical leap is that

4   the privileged communications would have been exactly or

5   substantially the same if there were confirmation of

6   insurance coverage.  Only in that way, would the

7   communications impacted or influenced the insurance decision.

8          And my thought with insurance coverage, the

9   landscape of the case from GEA's and its attorneys'

10  perspective would be substantially different than what they

11  faced in the underlying Thornton action.  As Judge Pisano

12  wrote, "The privileged communications were produced in a

13  period of uncertainty or in this case, lack of coverage, and

14  was never intended to be discoverable."  And I think the same

15  is true here.

16         And Judge Wolin similarly held in North River

17  Insurance Company v. Philadelphia Insurance, 797 F. Supp. 363

18  (D.N.J. 1992) that an insured does not automatically have

19  common interest between an insured and its counsel.  I think

20  this is an issue that was raised at the end in oral argument

21  by plaintiff's counsel.  Indeed, the common interest can only

22  be conferred when the carrier retains the attorney for the

23  insured.  To me, this makes sense because injecting a carrier

24  and its unique experience and influence over a litigation

25  significantly changes the dynamics of the relation from a

1    two-party relationship to a tri-partite relationship.

2              So weighing the importance and sanctity of

3    attorney-client privilege, the very limited circumstances in

4    which the privilege can be pierced, and the prevailing case

5    law in this district, I find the defendants have not met

6    their burden to demonstrate that GEA waived the privilege by

7    putting the confidential communication and information in

8    issue in this case or demonstrating that there's less

9    restrictive means to getting the same information.

10             So defendants' application to compel production of

11   privileged information and documents from plaintiffs is

12   denied.  And I'll enter an order incorporating that decision.

13             Everybody, just hold on one second.  Let me just

14   get everybody off the record.

15                      (Conclusion of proceedings)

16

17

18

19

20

21

22

23

24

25

|Hearing: Court's Ruling
|20-cv-09741, October 8, 2020                                     41
|Certification

1                          Certification

2          I, SARA L. KERN, Transcriptionist, do hereby certify

3     that the 41 pages contained herein constitute a full, true,

4     and accurate transcript from the official electronic

5     recording of the proceedings had in the above-entitled

6     matter; that research was performed on the spelling of proper

7     names and utilizing the information provided, but that in

8     many cases the spellings were educated guesses; that the

9     transcript was prepared by me or under my direction and was

10    done to the best of my skill and ability.

11         I further certify that I am in no way related to any of

12    the parties hereto nor am I in any way interested in the

13    outcome hereof.

14

15

16

17

18    S/ *Sara L. Kern*                    14th of October, 2020

19    _____    _____
      Signature of Approved Transcriber              Date

20

21
      Sara L. Kern, CET**D-338
22    King Transcription Services
      3 South Corporate Drive, Suite 203
23    Riverdale, NJ  07457
      (973) 237-6080
24

25